UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEAN-MARC ORLANDO,                          :

                Plaintiff,              :              14 Civ. 4102 (AJP)

          -against-                        :              **OPINION & ORDER**

BNP PARIBAS NORTH AMERICA, INC., ERIC       :
AULD & FRANCISCO OLIVEIRA

                                                     :

             Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

         Jean-Marc Orlando, a dual citizen of the United States and France, brings this action

against his former employer, defendant BNP Paribas North America, and former supervisors Eric

Auld and Francisco Oliveira, alleging that he was discriminated against on the basis of his religion,

subjected to a hostile work environment, and retaliated against for making complaints, in violation

of Title VII, the New York State Human Rights Law and the New York City Human Rights Law.

(Dkt. No. 2: Compl.)[1]

         Presently before the Court is defendants' summary judgement motion.  (Dkt. No. 66:

Notice of Motion).  The parties have consented to decision of this case by a Magistrate Judge

pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 26.)  For the reasons set forth below, defendants'

summary judgment motion is <u>DENIED</u> as to Orlando's claims for retaliation under Title VII, the

NYSHRL and the NYCHRL, except <u>GRANTED</u> to the extent that any Title VII claim concerning

---

[1]     Pursuant to a June 17, 2015 email between counsel, Orlando's ninth, tenth, and eleventh
claims for relief, for conspiracy to discriminate, violation of the equal protection clause, and
discriminatory discharge have been dismissed voluntarily.  (Dkt. No. 75: Def. Br. at 3 n.1;
Dkt. No. 82: Egan Aff. Ex. 13: 6/17/15 email.)

his bonus compensation is time barred.  Defendants' summary judgement motion is <u>DENIED</u> as to Orlando's claims for a hostile work environment under the NYSHRL and the NYCHRL, but <u>GRANTED</u> as to Orlando's claim for a hostile work environment under Title VII.  Defendants' summary judgment motion as to Orlando's claims for individual liability under the NYSHRL is <u>GRANTED</u> as to Oliveira but <u>DENIED</u> as to Auld.  Defendants' summary judgment motion as to Orlando's claims for employment discrimination is <u>GRANTED</u>.

## FACTS

### Background

The evidence in the summary judgment record, construed in the light most favorable to Orlando as the nonmoving party, is as follows:

Orlando practices Orthodox Judaism.  (Dkt. No. 2: Compl. ¶ 27.)  Orlando's grandparents lived in Tunisia during the Holocaust, and were directly affected by Adolf Hitler and the Nazi regime.  (Compl. ¶¶ 28-30.)  Management at BNP Paribas ("BNPP") was aware of Orlando's active religious practice.  (Compl. ¶ 31.)

In 1995, Orlando began working for BNP Paribas, S.A. in Paris, France.  (Dkt. No. 82: Egan Aff. Ex. 5: Orlando Dep. at 10-11.)  In 2001, Orlando moved to New York City with his family to work at BNPP as a French expatriate.  (Orlando Dep. at 13-14.)  In 2006, Orlando entered a three year expatriate contract with BNPP.  (Orlando Dep. at 26-28; <u>compare</u> Dkt. No. 74: Def. Rule 56.1 Stmt. ¶ 4 <u>with</u> Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 4.)  Later that year, Orlando became the global head of BNPP's electronic foreign exchange group, known as the "Algo Group," part of the bank's Fixed Income Department.  (Def. Rule 56.1 Stmt. & Orlando Counter Stmt. ¶ 6.)

In 2009, Orlando became a naturalized United States citizen.  (Orlando Rule 56.1 Counter Stmt. ¶ 4; Dkt. No. 86: Orlando Aff. ¶ 2.)  In September 2009, BNPP's Algo group split into two teams, the Algo Hedge group and the Algo Trading group.  (Def. Rule 56.1 Stmt. & Orlando Counter Stmt. ¶ 8.)  Orlando was placed in charge of the Algo Trading group, which was further subdivided into a High Frequency Trading team led by Simon Leger and a Medium Frequency Trading team led by Pierre-Yves Guillo.  (Def. Rule 56.1 & Orlando Counter Stmt. ¶ 9.)  In his new role, Orlando's global line manager was Eric Auld, and his local manager was Francisco Oliveira.  (Def. Rule 56.1 Stmt. & Orlando Counter Stmt. ¶ 10; Dkt. No. 88: Stern Aff. Ex. 9: 9/25/09 Email.)  At that time, Oliveira did not hold the FINRA licenses necessary to supervise Orlando, and Orlando asserts that during his time in the Algo Trading group he reported directly to Auld.  (Orlando Rule 56.1 Counter Stmt. ¶ 10 & n.2; Orlando Aff. ¶¶ 9-10.)

**BNPP 2011 Off-Site Seminar In Amsterdam and the Hitler Video**

On July 20, 2011, BNPP's foreign exchange group held a mandatory off-site training seminar in Amsterdam.  (Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 90; Dkt. No. 86: Orlando Aff. ¶ 62.)  At the first session, Auld, as Co-Head of the off-site seminar, introduced a video presentation that he partook in creating adapted from the movie "Downfall."  (Orlando Rule 56.1 Counter Stmt. ¶ 90; Orlando Aff. ¶ 62; Dkt. No 88: Stern Aff. Ex. 56: 1/17/13 Banks Disciplinary Hr'g Tr. at 12-13; Stern Aff. Ex. 58: 7/15/11 Email; Stern Aff. Ex. 61: 7/17/11 Email; Stern Aff. Ex. 63: 7/17/11 Subtitles Email.)  The video portrayed Adolf Hitler as the CEO of a BNPP competitor bank, and Nazi soldiers as competitor bank executives.  (Orlando Rule 56.1 Counter Stmt. ¶ 90; Orlando Aff. ¶ 62.)  In the video, which is subtitled, Hitler screams and curses at the soldiers in German.  (Orlando Rule 56.1 Counter Stmt. ¶ 90.)  The video included imagery symbolic of the Nazi regime including German army uniforms and swastikas, and referred to the "Third Reich," "my

Fuhrer," "Goebbels," and "a large Polish operation." (Orlando Rule 56.1 Counter Stmt. ¶¶ 90, 95; Orlando Aff. ¶ 62, 64; 7/17/11 Subtitles Email; Stern Aff. Ex. 88: Video; see also Dkt. No. 82: Egan Aff. Ex. 8: 7/17/11 Subtitles email.) After watching the video, Orlando told Auld that as a Jew he was "extremely offended" by it. (Orlando Rule 56.1 Counter Stmt. ¶ 96; Orlando Aff. ¶ 65; Egan Aff. Ex. 5: Orlando Dep. at 85.) Orlando also told Auld's deputy, Hubert de Lambilly, that he was deeply offended by the video, and that he had lost his grandfather during World War II and did not think the subject was a laughing matter. (Orlando Rule 56.1 Counter Stmt. ¶ 96; Orlando Aff. ¶ 65; Stern Aff. Ex. 66: BNPP Prelim. Investigation Report at 3.) De Lambilly recommended that Orlando complain to his management, "i.e., Eric Auld. " (BNPP Prelim. Investigation Report at 3; see also Orlando Rule 56.1 Counter Stmt. ¶ 96; Orlando Aff. ¶ 65.) De Lambilly also reported Orlando's complaint to Auld. (Orlando Rule 56.1 Counter Stmt. ¶ 96; BNPP Prelim. Investigation Report at 3.) Nevertheless, the video was shown a second time later in the seminar. (Orlando Rule 56.1 Counter Stmt. ¶ 96; Orlando Aff. ¶¶ 64, 65; Stern Aff. Ex. 55: BNPP Defense & Countercl. at 8(b), 8(f), 10(a); Stern Aff. Ex. 57: 1/6/13 Email at 2-3; Stern Aff. Ex. 65: 1/16/13 Disciplinary Hr'g Tr. at 5-8; BNPP Prelim. Investigation Report at 3; Stern Aff. Ex. 87: 2/5/13 Ltr. at 5; Stern Aff. Ex. 91: Orlando Dep. at 63-64.) Orlando was so distressed after the second screening that he was concerned about working with Auld going forward. (Orlando Rule 56.1 Counter Stmt. ¶ 96; Stern Aff. Ex. 91: Orlando Dep. at 100.)

Orlando met Auld for dinner in August 2011 and again expressed that he was deeply hurt "in his skin" by the video, especially in light of his personal experiences with anti-Semitism, and BNPP's "controversial" history. (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73; Stern Aff. Ex. 91: Orlando Dep. at 101, 103.) Auld asked Orlando what result he expected from their conversation, and Orlando said he expected a "simple apology and a simple action from [his]

managers to restore sanity." (Stern Aff. Ex. 91: Orlando Dep. at 107.) Auld requested that Orlando change the subject. (Orlando Rule 56.1 Counter Stmt. ¶ 108.) When Orlando persisted, Auld threatened him, told him to "shut the fuck up" and made an "absolutely bone chilling threat at [him] and [his] career." (Stern Aff. Ex. 91: Orlando Dep. at 107-08; <u>see also</u> Egan Aff. Ex. 5: Orlando Dep. at 337; Orlando Aff. ¶ 73; Dkt. No. 92: Egan Reply Aff. Ex. 6: Orlando Dep. at 112, 265.)

**<u>Orlando's 2011 Bonus Compensation is Reduced</u>**

In January 2012, prior to the announcement of year-end compensation bonuses, Orlando met Auld at the Landmark Hotel in London. (Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 108; Dkt. No. 86: Orlando Aff. ¶ 73.) Auld told Orlando that he might have "'some surprises'" with his 2011 bonus compensation and warned Orlando to prepare himself for the worst. (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73.) Orlando responded that since their August 2011 meeting, he felt that Auld had retaliated against him. (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73.) Orlando told Auld that he did "'not believe [he was] being judged fairly based on [his] accomplishments, rather [he was] being treated unfairly based on [his] complaints.'" (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73.) Auld responded angrily, telling Orlando: "'[s]top f***ing insinuating things. It is what it is: as I said to you, all captains are impacted.'" (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73.)

Defendants assert that BNPP's 2011 bonus pool was down by sixty-five percent from 2010, but Orlando disputes this assessment. (Dkt. No. 83: Auld Aff. Ex. C at 4039.)[2/] Defendants further state that in 2011, BNPP "established a protocol of ranking employees in Fixed Income in an effort to identify key personnel and provide compensation that would facilitate their continued

---

[2/]     While technically the human resources memorandum defendants offer to support this statement is hearsay (<u>see</u> Orlando Rule 56.1 Counter Stmt. ¶ 15), that can be cured at trial.

employment." (Dkt. No. 74: Def. Rule 56.1 Stmt. ¶ 17.)  BNPP employees were ranked in quartiles, with employees in the first quartile being essential and in the second quartile slightly less important. (Def. Rule 56.1 Stmt. ¶¶ 18-19.)  Orlando contends that even if management was instructed to use such a system, the assignment of quartile rankings was entirely discretionary, rather than measured against objective performance metrics.  (Orlando Rule 56.1 Counter Stmt. ¶¶ 17-19.)

Orlando was ranked in the second quartile (Dkt. No. 83: Auld Aff. ¶¶ 5-6), below Pierre-Yves Guillo, who reported to Orlando as head of the Algo Trade group's Medium Frequency desk (Orlando Rule 56.1 Counter Stmt. ¶¶ 21-22).  Orlando's 2011 bonus was €125,000, a reduction from €378,000 in 2010.  (Orlando Rule 56.1 Counter Stmt. ¶¶ 27(iii), 31; Orlando Aff. ¶ 24(iii).)

**Orlando's Termination From BNPP's New York City Office**

On March 15, 2012, Oliveira and Carlos Beltre, who was then BNPP's Fixed Income Regional Human Resources Business Partner, informed Orlando that his position with BNPP in New York was being terminated, and he would be repatriated to France.  (Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 75; Dkt. No. 86: Orlando Aff. ¶ 52; see also Dkt. No. 73: Beltre Aff. ¶¶ 2, 12.)  At that meeting, Orlando was given a letter, dated March 13, 2012.  (Orlando Rule 56.1 Counter Stmt. ¶ 75; see also Beltre Aff. ¶ 12 & Ex. C: 3/13/12 Ltr.; Orlando Aff. ¶ 52.)  The letter provided that Orlando's "temporary posting in New York" would end on May 1, 2012, and he would be reinstated at BNPP's Paris office, at the "K level of [BNPP's] collective agreement," with a gross salary of €79,352.39 (3/13/12 Ltr.; Orlando Aff. ¶ 52), a reduction from the $375,000 base salary he was paid in New York (Dkt. No. 88: Stern Aff. Ex. 23: 2009-2010 Compensation Stmt.).  The letter further provided that at the time of Orlando's return, he would receive compensation of €27,715.00 to be paid with his May 2012 salary.  (Orlando Rule 56.1 Counter Stmt. ¶ 75; Orlando Aff. ¶ 52; 3/13/12 Ltr.)  Orlando was confused by the phrase "temporary posting," because he understood that his

expatriate status had expired without renewal on August 31, 2009.  (Orlando Rule 56.1 Counter Stmt. ¶¶ 4, 75; Orlando Aff. ¶¶ 4, 6-7, 52; see also Dkt. No. 73: Beltre Aff. Ex. A: Expatriation Agreement with 8/31/09 expiration date; Stern Aff. Ex. 50 (no further contract after 8/31/09 expiration).)

On April 22, 2012, Orlando received a second letter, signed by Jan Verbrugge, BNPP's Director of Human Resources.  (Orlando Rule 56.1 Counter Stmt. ¶ 87; Orlando Aff. ¶ 52; Stern Aff. Ex. 53: 4/22/12 Ltr.)  The letter provided that Orlando would "reach the end of [his] expatriation period on May 1, 2012" and confirmed his "reinstatement in the Fixed Income department," where he would "be assigned to the position of Business Developer E-Banking Solutions in PARIS as early as May 2nd, 2012."  (4/22/12 Ltr.; Orlando Aff. ¶ 52; Orlando Rule 56.1 Counter Stmt. ¶ 88.)  On May 1, 2012, Orlando was terminated from BNPP's United States payroll.  (Orlando Rule 56.1 Counter Stmt. ¶ 89; Stern Aff. Ex. 54: 5/6/12 Email; see Orlando Aff. ¶ 57.)  Orlando never reported to work in BNPP's Paris office.  (Orlando Rule 56.1 Counter Stmt. ¶ 89; Stern Aff. Ex. 54: 5/6/12 Email.)

## ANALYSIS

### I.  LEGAL PRINCIPLES

#### A.  General Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., 553 F.

App'x 13, 14 (2d Cir. 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)). Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are

to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[3/]
The Court draws all inferences in favor of the non-moving party only after determining that such
inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v.
DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to
the issue on which summary judgment is sought, there is any evidence in the record from any source
from which a reasonable inference could be drawn in favor of the nonmoving party, summary
judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested
issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See,
e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v.
U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).
To evaluate a fact's materiality, the substantive law determines which facts are critical and which
facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.
While "disputes over facts that might affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or
unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g.,
Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

---

[3/]    See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 552 F. App'x 47, 49
        (2d Cir. 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New
        York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36;
        Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

**B.    Additional Summary Judgment Standards In Employment Discrimination Cases**

When a case turns on the intent of one party, as employment discrimination and retaliation claims often do, a "trial court must be cautious about granting summary judgment." <u>Gallo</u> v. <u>Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).[4/]   Because the employer rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions.  <u>E.g.</u>, <u>Gallo</u> v. <u>Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d at 1224.  "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error."  <u>Danzer</u> v. <u>Norden Sys., Inc.</u>, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).   Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination or retaliation, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer.  <u>E.g.</u>, <u>Budde</u> v. <u>H&K Distrib. Co.</u>, No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at *1 (2d Cir. June 29, 2000); <u>Stern</u> v. <u>Trs. of Columbia Univ.</u>, 131 F.3d 305, 312 (2d Cir. 1997); <u>Meloff</u> v. <u>N.Y. Life Ins. Co.</u>, 51 F.3d 372, 375 (2d Cir. 1995).

---

[4/]    <u>Accord</u>, <u>e.g.</u>, <u>Feingold</u> v. <u>New York</u>, 366 F.3d 138, 149 (2d Cir. 2004); <u>Kerzer</u> v. <u>Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998) ("[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment."); <u>McLee</u> v. <u>Chrysler Corp.</u>, 109 F.3d 130, 135 (2d Cir. 1997) ("[C]aution must be exercised in granting summary judgment where motive is genuinely in issue."); <u>Cardozo</u> v. <u>Healthfirst, Inc.</u>, 210 F. Supp. 2d 224, 227 (S.D.N.Y. 1999); <u>see also</u>, <u>e.g.</u>, <u>Chambers</u> v. <u>TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 40 (2d Cir. 1994).

In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d at 312; see, e.g., Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("[T]he question [on summary judgment is] . . . whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (quotations & alterations omitted)), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'").[5/]  Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'" Weinstock v. Columbia Univ., 224 F.3d at 41.

**C.    Governing Legal Standard For Title VII Cases**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of

---

[5/]    See also, e.g., Budde v. H&K Distrib. Co., 2000 WL 900204 at *1; Scaria v. Rubin, 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), aff'd, 117 F.3d 652 (2d Cir. 1997).

employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C.

§ 2000e-2(a)(1).

        In connection with discrimination claims under Title VII, the Second Circuit applies

the burden-shifting analysis established by the Supreme Court in <u>McDonnell Douglas Corp.</u> v.

<u>Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).[6/]  <u>See</u>, <u>e.g.</u>, <u>Vega</u> v. <u>Hempstead Union Free</u>

---

[6/]    Employment discrimination claims brought under the NYSHRL and the NYCHRL also are analyzed using the <u>McDonnell Douglas</u> analysis.  <u>E.g.</u>, <u>Teasdale</u> v. <u>N.Y.C. Fire Dep't, FDNY</u>, 574 F. App'x 50, 51 (2d Cir. 2014); <u>Spiegel</u> v. <u>Schulmann</u>, 604 F.3d 72, 80 (2d Cir. 2010) ("This Court has determined that a plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII."); <u>Fall</u> v. <u>N.Y.S. United Teachers</u>, 289 F. App'x 419, 422 (2d Cir. 2008) ("The <u>McDonnell Douglas</u> burden-shifting analysis 'is also applicable to [the plaintiff's] claims under the NYSHRL.'"); <u>Villar</u> v. <u>City of N.Y.</u>, 09 Civ. 7400, ---F. Supp. 3d----, 2015 WL 5707125 at *8 (S.D.N.Y. Sept. 29, 2015); <u>John</u> v. <u>Dep't of Info. Tech. & Telecomm.</u>, 06 Civ. 13119, 2008 WL 4694596 at *3 (S.D.N.Y. Oct. 23, 2008) (<u>McDonnell Douglas</u> analysis applies to NYSHRL and NYCHRL claims.); <u>Sandiford</u> v. <u>City of N.Y. Dep't of Educ.</u>, 22 N.Y.3d 914, 916 n.2; 977 N.Y.S.2d 699, 700 n.2 (2013); <u>Forrest</u> v. <u>Jewish Guild for the Blind</u>, 3 N.Y.3d 295, 305 n.3, 786 N.Y.S.2d 382, 391 n.3 (2004) ("The standards for recovery under the New York State Human Rights Law are the same as the federal standards under [T]itle VII of the Civil Rights Act of 1964.  Thus, '[b]ecause both the Human Rights Law and [T]itle VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of this appeal.'  Further, the human rights provisions of the New York City Administrative Code mirror the provisions of the [New York State] Executive Law and should therefore be analyzed according to the same standards." (citations omitted)).

    However, the NYCHRL is to be more liberally construed.  <u>E.g.</u>, <u>Baldwin</u> v. <u>Goddard Riverside Cmty. Ctr.</u>, No. 14-4046, ---F. App'x----, 2015 WL 5294926 at *2 (2d Cir. Sept. 11, 2015); <u>Lenart</u> v. <u>Coach Inc.</u>, 15 Civ. 1922, ---F. Supp. 3d----, 2015 WL 5319735 at *2 (S.D.N.Y. Sept. 11, 2015); <u>Adams</u> v. <u>City of N.Y.</u>, 837 F. Supp. 2d 108, 128 (E.D.N.Y. 2011); <u>Melman</u> v. <u>Montefiore Med. Ctr.</u>, 98 A.D.3d 107, 112, 946 N.Y.S.2d 27, 30 (1st Dep't 2012); <u>Williams</u> v. <u>N.Y.C. Hous. Auth.</u>, 61 A.D.3d 62, 75, 872 N.Y.S.2d 27, 37-38 (1st Dep't), <u>appeal denied</u>, 13 N.Y.3d 702, 885 N.Y.S.2d 716 (2009); <u>see also</u>, <u>e.g.</u>, <u>Hanna</u> v. <u>N.Y. Hotel Trades Council</u>, 18 Misc. 3d 436, 438 n.1, 851 N.Y.S.2d 818, 822 n.1 (Sup. Ct. N.Y. Cnty. 2007) ("NYCHRL is to be liberally and independently construed with the aim of making it more protective than its federal . . . or state . . . counterparts.").  As I previously explained:  "As this Court has pointed out several times, while the cases . . . employ the

(continued...)

Sch. Dist., No. 14-2265, ---F.3d----, 2015 WL 5127519 at *8 (2d Cir. Sept. 2, 2015); Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012); Desir v. City of N.Y., 453 F. App'x 30, 33 (2d Cir. 2011); Leibowitz v. Cornell Univ., 584 F.3d at 498.

        Under the familiar McDonnell Douglas burden-shifting analysis, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981);  see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.[7/] Establishment of a prima facie case "'in effect creates a presumption that the employer unlawfully

---

6/      (...continued)
same federal analysis to NYCHRL claims, the legislative history of the NYCHRL makes clear that it is to be even more liberally construed than the federal and state anti-discrimination laws." Viruet v. Citizen Advice Bureau, 01 Civ. 4594, 2002 WL 1880731 at *14 n.28 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.) (quotations omitted; citing cases).  Because the parties in this case have not argued for a different result under the NYCHRL than the NYSHRL or Title VII, and because Orlando's claims survive summary judgment under Title VII or the NYSHRL (see below), the Court will not pursue the issue any further in this case.

7/      See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. 44, 50 n.3, 124 S. Ct. 513, 517 n.3 (2003); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310, 116 S. Ct. 1307, 1309 (1996); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 2746-47 (1993); Vega v. Hempstead Union Free Sch. Dist., 2015 WL 5127519 at *8; Ruszkowski v. Kaleida Health Sys., 422 F. App'x 58, 60 (2d Cir. 2011); United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011); Leibowitz v. Cornell Univ., 584 F.3d at 498; Dorfman v. Doar Commc'ns, Inc., 314 F. App'x 389, 390 (2d Cir. 2009); DeSalvo v. Volhard, 312 F. App'x 394, 396 (2d Cir.), cert. denied, 558 U.S. 932, 130 S. Ct. 70 (2009); Fall v. N.Y.S. United Teachers, 289 F. App'x at 420-21; Nader v. ABC Television, Inc., 150 F. App'x 54, 55 (2d Cir. 2005); Mandell v. Cnty. of Suffolk, 316 F.3d 368, 377-78 (2d Cir. 2003); Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2002); Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

discriminated against the employee.'" St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506, 113 S. Ct. at 2747 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094).[8/]

       Once a plaintiff claiming employment discrimination establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106; McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.[9/] The burden on the defendant at this phase is one of production rather than persuasion. E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142, 120 S. Ct. at 2106.[10/]

---

[8/]    See also, e.g., Vega v. Hempstead Union Free Sch. Dist., 2015 WL 5127519 at *8; Crawford v. Dep't of Investigation, 324 F. App'x 139, 141 (2d Cir. 2009); Smith v. New Venture Gear, Inc., 319 F. App'x 52, 54 (2d Cir. 2009); Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006), cert. denied, 549 U.S. 1282, 127 S. Ct. 1855 (2007); Mandell v. Cnty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).

[9/]    See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. at 50 n.3, 124 S. Ct. at 517 n.3; O'Connor v. Consol. Coin Caterers Corp., 517 U.S. at 310, 116 S. Ct. at 1309; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94; Vega v. Hempstead Union Free Sch. Dist., 2015 WL 5127519 at *8; Desir v. City of N.Y., 453 F. App'x at 33-34; United States v. Brennan, 650 F.3d at 93; Leibowitz v. Cornell Univ., 584 F.3d at 498-99; Dorfman v. Doar Commc'ns, Inc., 314 F. App'x at 390; DeSalvo v. Volhard, 312 F. App'x at 396; Fall v. N.Y.S. United Teachers, 289 F. App'x at 421; Nader v. ABC Television, Inc., 150 F. App'x at 55; Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Mandell v. Cnty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Schnabel v. Abramson, 232 F.3d at 88; Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Scaria v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38.

[10/]    See also, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096; Chiang v. Donahoe, 579 F. App'x 39, 42 (2d Cir. 2014); Terry v. Ashcroft, 336 F.3d at 144 n.17; Scaria v. Rubin, 117 (continued...)

"Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106.

If the defendant articulates a non-discriminatory reason, the McDonnell Douglas burden-shifting framework drops out of the picture, and the plaintiff must show that the adverse employment decision more likely than not was motivated in whole or part by discriminatory reasons. E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106.[11] "Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 255 n.10, 101 S. Ct. at 1095 n.10).

The Supreme Court in 2000 clarified the standard at this stage of the McDonnell Douglas analysis:

---

[10]    (...continued)
F.3d at 654.

[11]    See also, e.g., Raytheon Co. v. Hernandez, 124 S. Ct. at 517 n.3; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 510, 113 S. Ct. at 2749; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253, 101 S. Ct. at 1093-94; Vega v. Hempstead Union Free Sch. Dist., 2015 WL 5127519 at *8; Allen v. Murray-Lazarus,463 F. App'x 14, 16 (2d Cir. 2012); Desir v. City of N.Y., 453 F. App'x at 34; United States v. Brennan, 650 F.3d at 93; Leibowitz v. Cornell Univ., 584 F.3d at 499; DeSalvo v. Volhard, 312 F. App'x at 396; Fall v. N.Y.S. United Teachers, 289 F. App'x at 421; Feingold v. New York, 366 F.3d at 152; Mandell v. Cnty. of Suffolk, 316 F.3d at 380-81; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Weinstock v. Columbia Univ., 224 F.3d at 42; Scaria v. Rubin, 117 F.3d at 654.

[I]n St. Mary's Honor Center . . . . we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff.  The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct."  In other words, "[i]t is not enough . . . to dis believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."

In reaching this conclusion, however, we reasoned that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."  Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.  Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.  To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56], and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's

> explanation is false, and any other evidence that supports the employer's case and
> that properly may be considered on a motion for judgment as a matter of law.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 146-49, 120 S. Ct. at 2108-09 (emphasis

added & citations omitted).

After Reeves, the Second Circuit has made clear that merely proving a prima facie

case and disproving the employer's explanation for its conduct at the third step of the McDonnell

Douglas analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis

is necessary:

> In examining the impact of Reeves on our precedents, we conclude that
> Reeves prevents courts from imposing a per se rule requiring in all instances that [a
> Title VII] claimant offer more than a prima facie case and evidence of pretext. . . .
> But the converse is not true; following Reeves, we decline to hold that no [Title VII]
> defendant may succeed on a summary judgment motion so long as the plaintiff has
> established a prima facie case and presented evidence of pretext.  Rather, we hold
> that the Supreme Court's decision in Reeves clearly mandates a case-by-case
> approach, with a court examining the entire record to determine whether the plaintiff
> could satisfy his "ultimate burden of persuading the trier of fact that the defendant
> intentionally discriminated against the plaintiff."

Schnabel v. Abramson, 232 F.3d at 90 (emphasis added).[12/]

---

[12/]    See also, e.g., Braun v. Securitas Sec. Servs. USA, Inc., 372 F. App'x 113, 114 (2d Cir.
2010); Butts v. N.Y.C. Dep't of Hous. Pres. & Dev., 307 F. App'x 596, 599 (2d Cir. 2009);
Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005); Feingold v. New York, 366
F.3d at 152; Roge v. NYP Holdings, Inc., 257 F.3d 164, 167-68 (2d Cir. 2001); Abdu-
Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469-70 (2d Cir.), cert. denied, 534 U.S. 993,
122 S. Ct. 460 (2001); James v. N.Y. Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000);
Weinstock v. Columbia Univ., 224 F.3d at 42 ("In short, the question becomes whether the
evidence, taken as a whole, supports a sufficient rational inference of discrimination.");
Aksamit v. 772 Park Ave. Corp., 00 Civ. 5520, 2003 WL 22283813 at *6 (S.D.N.Y. Oct. 2,
2003) ("[A] plaintiff's establishment of a prima facie case and rebuttal of a
nondiscriminatory reason for the adverse action do not save the plaintiff from summary
judgment when there is insufficient evidence of discrimination."), aff'd, 128 F. App'x 204
(2d Cir. 2005); Weiser v. Forest Pharm., Inc., 99 Civ. 1809, 2001 WL 293951 at *7-8
(S.D.N.Y. Mar. 26, 2001); Tanay v. St. Barnabas Hosp., 99 Civ. 9215, 2001 WL 262695 at
*4 (S.D.N.Y. Mar. 15, 2001); Connell v. Consol. Edison Co., 109 F. Supp. 2d 202, 207-08
(continued...)

## II.    TIMELINESS OF ORLANDO'S CLAIMS

Defendants assert that all of Orlando's Title VII claims are barred by his failure to timely file a charge with the EEOC.  (Dkt. No. 75: Def. Br. at 9-10.)  Orlando asserts that his claims are timely, or alternatively, that he should be given the benefit of equitable tolling.  (Dkt. No. 85: Orlando Opp. Br. at 12-14.)

Title VII requires that a plaintiff file a charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of an alleged discriminatory act.  42 U.S.C. § 2000e–5(e)(1).  A claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct.  See, e.g., Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S. Ct. 498, 504 (1980); Flaherty v. Metromail Corp., 235 F.3d 133, 137 (2d Cir. 2000).  "In order to establish an 'evenhanded administration of the law,' district courts must follow the Supreme Court's warning not to disregard the timing requirements simply because we may feel sympathy for a particular litigant."  Smith v. Henderson, 137 F. Supp. 2d 313, 317-18 (S.D.N.Y. 2001) (quoting Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 152, 104 S. Ct. 1723, 1726 (1984)).  "'[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'"  Downey v. Runyon, 160 F.3d 139, 145 (2d Cir. 1998) (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S. Ct. 1127, 1132 (1982)).

---

[12]/     (...continued)
(S.D.N.Y. 2000) (Chin, D.J.) ("The key is whether there is sufficient evidence in the record – whether it consists of just the prima facie case and proof of pretext alone or those items together with additional evidence – to support an inference of discrimination.").

"[E]quitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing his lawsuit." Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, 60-61 (2d Cir. 1986).  Equitable estoppel may be invoked when the employer has misrepresented the length of the limitations period or in some other way has "'lulled the plaintiff into believing that it was not necessary for him to commence litigation.'" Id. at 61 (quoting Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 50 (2d Cir. 1985) ("One factor that frequently appears in the estoppel cases is a settlement negotiation. Thus, where the defendant assures the plaintiff that he intends to settle and the plaintiff, in reasonable reliance on that assurance, delays in bringing his suit until after the statute has run, the defendant may be estopped to rely on the limitations defense.").   "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995); accord, e.g., Riddle v. Citigroup, 449 F. App'x 66, 69 (2d Cir. 2011).

Equitable tolling, alternatively, is based on the principle that "statute of limitations does not run against a plaintiff who is unaware of his cause of action." Dillman v. Combustion Eng'g, Inc., 784 F.2d at 60 (quotation & citation omitted).  "Equitable tolling of the 300-day statutory deadline is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights."  Walker v. Linklaters LLP, 948 F. Supp. 2d 396, 399-400 (S.D.N.Y. 2013) (quotation & alteration omitted).

Orlando has not met the standard for equitable estoppel or equitable tolling.  But because of the specific tolling agreement with BNPP, his EEOC complaint is timely as to his termination.  It is undisputed that on January 7, 2013 BNPP agreed, at Orlando's request, to toll the

statute from January 7 until January 18, 2013.  (Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 85; Dkt. No. 88: Stern Aff. Ex. 86: 1/7/13 Email; Def. Br. at 9 n.6.)   Orlando contends that he filed his charge on January 22, 2013, the first business day after the conclusion of the toll (January 19 and 20, 2013 were a Saturday and Sunday, and January 21, 2013 was Martin Luther King, Jr. Day), but that it was stamped as received by the EEOC on January 23, 2013.  (Orlando Rule 56.1 Counter Stmt. ¶ 85; Dkt. No. 86: Orlando Aff. ¶ 57; Dkt. No. 88: Stern Aff. Ex. 70: EEOC Charge.)

Had Orlando filed his EEOC charge on January 7, 2013, it would have been timely for his retaliatory termination claim, which accrued on March 15, 2012, when he was told his BNPP position in New York was terminated.  (See page 6 above.)  Indeed, he could have filed by January 10, 2013, 300 days after the termination notice on March 15, 2012.  Thus, Orlando had three "unused" days at the time of the tolling agreement.  Courts are instructed to consider the "unused" portion of the limitations period as a "significant circumstance to be evaluated in assessing the plaintiff's punctuality."  Buttry v. Gen. Signal. Corp., 68 F.3d at 1494; see also, e.g., Melendez v. Wilson, 04 Civ. 0073, 2006 WL 2621083 at *9 (S.D.N.Y. Sept. 12, 2006).  If the EEOC charge was filed "after hours" on January 22 and thus not stamped filed until the morning of January 23, or even if contrary to Orlando's evidence he only filed on January 23, the 300 day period (inclusive of the toll from January 7 to January 18) still would include his March 15, 2012 termination.  However, the events prior to his termination (i.e. the Hitler video and Orlando's bonus) are time barred under Title VII.

The NYSHRL and the NYCHRL each have a three-year statute of limitations. N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d).  This action was filed on June 6, 2014. Accordingly, claims that accrued after June 6, 2011 are timely under the NYSHRL and NYCHRL.

Since the Hitler video was shown on July 20, 2011 all of Orlando's claims under the NYSHRL and NYCHRL are timely.

### III.   ORLANDO'S RETALIATION CLAIM IS SUFFICIENTLY ALLEGED

Orlando's retaliation claim is based on his March 15, 2012 termination from BNPP's New York office, and the reduced bonus compensation he received for his 2011 performance.  (Dkt. No. 85: Orlando Opp. Br. at 21-22.)  Orlando's claim for retaliatory termination is timely under Title VII, the NYSHRL and NYCHRL.  (See pages 20-21 above.)  Orlando's claim that his reduced bonus compensation was retaliatory is timely only under the NYSHRL and NYCHRL.  (See pages 20-21 above.)

### A.   Retaliation Standard

Under Title VII, it is unlawful for an employer to "retaliate" by discriminating against an employee because the employee engaged in protected activity, that is, "has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).[13]

---

[13]   See, e.g., Univ. Tex. Sw. Med. Ctr. v. Nasser, 555 U.S. 271, 274, 133 S. Ct. 2517, 2528 (2013); Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 129 S. Ct. 846, 850 (2009); Chiang v. Donahoe, 579 F. App'x 39, 40 (2d Cir. 2014); Sengillo v. Valeo Elec. Sys., Inc., 328 F. App'x 39, 40-41 (2d Cir. 2009); Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 120-21 (2d Cir. 2008), cert. denied, 558 U.S. 932, 130 S. Ct. 56 (2009); Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 241 (2d Cir. 2007); Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006); Terry v. Ashcroft, 336 F.3d 128, 140 (2d Cir. 2003); Diaz v. Weill Med. Ctr. of Cornell Univ., 02 Civ. 7830, 2004 WL 285947 at *21 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.), aff'd, 138 F. App'x 362 (2d Cir. 2005); Minott v. Port Auth. of N.Y. & N.J., 116 F. Supp. 2d 513, 520, 524 (S.D.N.Y. 2000) ("Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding."); see also Manoharan v. Columbia Univ. Coll. of
(continued...)

"To succeed on a claim of retaliation, a plaintiff must show that 1) the employee engaged in a protected activity; 2) the employer was aware of that activity; 3) the employee suffered an adverse employment action; and 4) there was a causal connection between the protected activity and the adverse employment action." Blanco v. Brogan, 620 F. Supp. 2d 546, 553 (S.D.N.Y. 2009); accord, e.g., Littlejohn v. City of N.Y., 795 F.3d 297, 316 (2d Cir. 2015); Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d at 205-06; Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); Weixel v. Bd. of Educ., 287 F.3d 138, 148-49 (2d Cir. 2002).[14/]

Title VII retaliation claims also are governed by the McDonnell Douglas burden-shifting analysis. E.g., Littlejohn v. City of N.Y., 795 F.3d at 316 11; Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014); Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552-53 (2d Cir. 2010).[15/] Thus, once a plaintiff makes out a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action. E.g., Kaytor v. Elec. Boat Corp., 609 F.3d at 552-53; Hicks v. Baines, 593 F.3d at 164; Jute v. Hamilton Sundstrand Corp., 420 F.3d at 173. If the defendant meets this burden, to avoid summary judgment

---

[13/]   (...continued)
Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) ("The objective of [the section prohibiting retaliation] is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice.").

[14/]   See also, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001); Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000); Chinnery v. N.Y.S. Office of Children & Family Servs., 10 Civ. 882, 2014 WL 1651950 at *11 (S.D.N.Y. Apr. 25, 2014), report & rec. adopted, 2015 WL 1029601 (S.D.N.Y. Mar. 10, 2015); Munck v. New Haven Sav. Bank, 251 F. Supp. 2d 1078, 1085 (D. Conn. 2003).

[15/]   See also, e.g.,  Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005); Terry v. Ashcroft, 336 F.3d at 141; Diaz v. Weill Med. Ctr. of Cornell Univ., 2004 WL 285947 at *21 & n.27 (& cases cited therein).

the plaintiff must point to evidence sufficient to present an inference that the proffered reason is a mere pretext for retaliation.  E.g., Kirkland v. Cablevision Sys., 760 F.3d at 225; Kaytor v. Elec. Boat Corp., 609 F.3d at 552-53; Hicks v. Baines, 593 F.3d at 164; Jute v. Hamilton Sundstrand Corp., 420 F.3d at 173.

Causation can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees. See, e.g., Kercado-Clymer v. City of Amsterdam, 370 F. App'x 238, 242-43 (2d Cir. 2010); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d at 224; DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965, 108 S. Ct. 455 (1987).  "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. at 2533; accord, e.g., Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 n.5 (2d Cir. 2013).

**B.**      **Orlando Has Presented Sufficient Evidence To Raise A Question Of Fact Regarding Who InitiatedThe Adverse Employment Decisions Affecting Him**

Defendants first assert that Orlando cannot establish a causal connection between his complaints about the Hitler video and any adverse employment action.  (Dkt. No. 75: Def. Br. at 22-24; Dkt. No. 91: Def. Reply Br. at 7-10.)  Defendants contend that because "Oliveira was [the] decision maker and knew nothing about [Orlando's] purported complaint, Orlando's retaliation claims fail as a matter of law."  (Def. Br. at 23.)

Orlando has presented evidence to demonstrate that while Oliveira was his local manager, Auld had some level of discretion and control over employment decisions affecting

Orlando.  For example, as to Orlando's termination, in a December 2, 2011 email discussing the

year's successes and failures, Auld wrote that Orlando's desk "is unstable and we may have to make

changes next year." (Dkt. No. 88: Stern Aff. Ex. 41: 12/2/11 Email at 2.)  In a later email discussing

his own 2012 performance, Auld notes "[I] made some tough decisions (Orlando . . .) . . . [T]raders

. . . say very strongly that I made the right call." (Stern Aff. Ex. 43: 12/16/12 Email at 3.)  Further,

in a January 8, 2013 meeting between Auld and other BNPP executives, Auld stated that the

decision to repatriate Orlando to France was a "joint decision with Francisco de Oliveira." (Stern

Aff. Ex. 20: 1/8/13 Meeting Notes at 3.)  Likewise, in an internal investigation report following the

video incident, Auld is referred to as Orlando's management.  (Stern Aff. Ex. 66: BNPP Prelim.

Investigation Report at 3.)

As to Orlando's bonus compensation, Auld is identified as Orlando's "Direct

Manager" for bonuses in a compensation review spreadsheet, while Orlando's direct salary manager

is identified as being "Not Defined." (Dkt. No. 88: Stern Aff. Ex. 4: 11/19/12 Email at 5.)  In

contrast, for numerous employees on the same spreadsheet Auld is identified as the direct manager

for bonus, and Oliveira is identified as the direct salary manager.  (See, e.g., Stern Aff. Ex. 4:

11/19/12 Email at 1, spreadsheet lines 4, 10.)  Further, as a manager with multiple trading teams

under his supervision, Auld set the bonus pool for the entirety of the Algo Trade team.  (Dkt. No.

83: Auld Aff. ¶ 10.)  Because Auld knew Orlando's quartile ranking prior to setting the Algo Trade

team bonus pool (compare Stern Aff. Ex. 30 at 3: 12/14/11 email with Auld. Aff. ¶ 10), he implicitly

limited Orlando's bonus to no more than €175,000 (as only thirty-five percent of the €500,000 pool

was available to employees quartiled two and below).

Thus, while defendants contend that Oliveira was Orlando's direct manager and

initiated all decisions pertaining to his bonus compensation and termination (Def. Br. at 22-23; Def.

Reply Br. at 7), Orlando has presented sufficient evidence to raise a question of fact for the jury regarding whether Auld influenced or controlled those decisions.

C.    **Orlando Has Presented Sufficient Evidence To Establish Pretext and Retaliatory Animus**

Defendants next assert that "Orlando cannot point to any concrete facts showing that the Bank acted with any retaliatory animus," or show that defendants' stated reasons for their adverse employment decisions are pretexts for retaliation.   (Dkt. No. 91: Def. Reply Br. at 10; Dkt. No. 75: Def. Br. at 24-25.)  A showing of causation "'tend[s] to collapse as a practical matter under the McDonnell Douglas framework'" with a showing of pretext.  Jeffrey v. Montefiore Med. Ctr., 11 Civ. 6400, 2013 WL 5434635 at *20 (S.D.N.Y. Sept. 27, 2013) (quoting Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 n.1 (2d Cir.2002)).  To establish pretext, Orlando "must produce not simply some evidence, but sufficient evidence to support a rational finding that the . . . reasons proffered by the defendant" for his bonus compensation and termination are "false, and that more likely than not [retaliation] was the real reason for the employment action." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (quotations & alterations omitted); see also cases cited at page 11 above. "Plaintiffs may establish pretext and thereby successfully oppose summary judgment, . . . by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action." Lyman v. N.Y. & Presbyterian Hosp., 11 Civ. 3889, 2014 WL 3417394 at *14 (S.D.N.Y. July 14, 2014) (quotations omitted).

Defendants have articulated several legitimate reasons for Orlando's termination and reduced bonus compensation.  (See generally Dkt. No. 75: Def. Br. at 12-15.)  For example, Orlando's 2011 performance review – prepared by Auld, however – reflected management

deficiencies, marked by infighting on his team and poor cooperation.  (Dkt. No. 73: Beltre Aff. Ex.
I: Orlando 2011 Review at 3, 6.)  Further, in early 2011 Orlando's desk lost three million euros in
a single day, prompting an investigation by BNPP's Inspection Generale.  (Def. Br. at 12; Orlando
2011 Review at 3; Dkt. No. 71: Oliveira Aff. ¶¶ 35-36.)  Additionally, the Algo Trade group fell
short on its annual revenue targets.  (Def. Br. at 12; Oliveira Aff. ¶ 44.)

      Orlando asserts that there are several weaknesses in defendants' proffered legitimate
reasons, and that defendants are pretextually mischaracterizing his performance.  (Dkt. No. 85:
Orlando Opp. Br. at 24.)  As to his management skill, Orlando presents evidence that as of July
2011, Auld's supervisor, Amblard, viewed Orlando as a candidate for the French HC promotion
which required a level of business and management responsibility, true value added, potential for
further evolution, and adaptability to new responsibilities.  (Dkt. No. 88: Stern Aff. Ex. 84: HC 2012
Promotion Email.)  Further, Orlando asserts that one of the Algo Trade employees with whom he
was alleged to have friction, Pierre Yves Guillo (Oliveira Aff. ¶¶ 27-30), was seen as problematic
within the team and was someone Orlando previously had been asked to "'build a dossier'" on to
create "a record."  (Dkt. No. 86: Orlando Aff. ¶ 51; Stern Aff. Ex. 91: Orlando Dep. at 227-28).
Orlando next contends that the Inspector General report was unrelated to the Algo Trade group's
loss, and was instead a general audit of the Fixed Income group.  (Orlando Aff. ¶ 39; Stern Aff. Ex.
35: 5/18/11 Email.)  Orlando also has presented evidence to show that the Algo Trade group's 2011
performance was viewed internally at BNPP as "[e]xcellent" (Stern Aff. Ex. 83: Auld 2011 Review
at 8), and relative to the Fixed Income Group as whole the Algo Trade group was much closer to
meeting its 2011 budget.  (Stern Aff. Ex. 89: compare Auld Dep. at 91-92 with id. at 96.)

      Additionally, a reasonable juror could reject defendants' legitimate reasons in favor
of Orlando's contention that the decisions were made on the basis of retaliatory animus.  (Orlando

Opp. Br. at 6.)  Orlando testified that he met Auld in London at the end of summer 2011 and complained about the Hilter video.  (<u>See</u> pages 4-5 above.)  Orlando testified that in response, Auld told him to "shut the fuck up" and made an "absolutely bone chilling threat at [him] and [his] career."  (<u>See</u> pages 4-5 above.)  When Orlando and Auld met again, Auld warned Orlando that he might have "'some surprises'" with his bonus compensation.  (<u>See</u> page 5 above.)[16/]

        While Auld disputes Orlando's testimony, a jury could credit it and conclude that Auld initiated a chain of events to terminate Orlando to protect himself from negative consequences that might arise if Orlando were to escalate complaints about the Hitler video.  Orlando's testimony regarding Auld's threats is sufficient direct evidence of retaliatory animus to establish a causal connection and demonstrate pretext, thereby precluding summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Jeffrey</u> v. <u>Montefiore Med. Ctr.</u>, 11 Civ. 6400, 2013 WL 5434635 at *22 (S.D.N.Y. Sept. 27, 2013) ("It is true that Plaintiff's proffered evidence consists almost exclusively of her own testimony, which with few

---

[16/]     Defendants argue that Auld's positive conduct toward Orlando between the Hitler video showing and Orlando's termination negates any inference of retaliatory animus.  (Def. Br. at 24.)  In two of the cases cited by defendants, two or more years and numerous positive employment actions occurred between the employees' protected activity and the allegedly retaliatory action.  <u>See</u> <u>Pace Univ.</u> v. <u>N.Y.C. Comm'n on Human Rights</u>, 85 N.Y.2d 125, 129, 623 N.Y.S.2d 765, 767(1995); <u>Budzanoski</u> v. <u>Pfizer, Inc.</u>, 245 A.D.2d 72, 72, 664 N.Y.S.2d 796, 796 (1st Dep't1997).  In the third case cited by defendants, the Court applied the "same actor" inference in finding that plaintiff could not sustain a national origin discrimination claim against the supervisor who promoted her.  <u>Figueroa</u> v. <u>N.Y. Health & Hosps. Corp.</u>, 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007).  The same actor inference is not mandatory.  <u>See</u>, <u>e.g.</u>, <u>Feingold</u> v. <u>New York</u>, 366 F.3d 138, 154-55 n.15 (2d Cir. 2004) ("We do not pass judgment on the extent to which this [same actor] inference is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it generally is applied."); <u>Memnon</u> v. <u>Clifford Chance US, LLP</u>, 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009) ("[A]s several courts have found, the same-actor inference is permissive, not mandatory.").  In light of Auld's alleged overtly threatening behavior, and the relatively passive nature of his intervening supportive behavior (<u>see</u>, <u>e.g.</u>, Stern Aff. Ex. 84: 11/7/11 Email; Stern Aff. Ex. 30: 12/14/11 Email), the Court declines to apply the same actor inference here.  It will be up to the jury to evaluate all of Auld's conduct toward Orlando.

exceptions lacks any independent corroboration. . . .  Plaintiff's claim survives at this stage because this a classic 'he said, she said' situation that is not amenable to summary judgment." (quotation & citation omitted)); Bryant v. Merrill Lynch, Pierce, Fenner & Smith, 12 Civ. 2940, 2013 WL 2359109 at *7 (S.D.N.Y. May 30, 2013) ("If [plaintiff's] testimony is credited, a jury could readily conclude that retaliatory animus motivated Defendant's failure to promote Plaintiff . . . ."); Abel v. Morabito, 04 Civ. 7284, 2009 WL 321007 at *2 (S.D.N.Y. Feb. 10, 2009) (noting in First Amendment context that "direct evidence such as comments by the defendants, may suffice to meet [plaintiff's] burden" of demonstrating a causal connection between the protected activity and the adverse action); Rolon v. Ward, 05 Civ. 168, 2008 WL 4700705 at *25 (S.D.N.Y. Oct. 24, 2008) (in First Amendment context, supervisor's statement in plaintiff's evaluation that he "'sets himself back with personal complaints'" could constitute direct evidence of a causal connection to retaliation), aff'd, 345 F. App'x 608 (2d Cir. 2009).[17]

Because "[t]he anti-retaliation provisions in Title VII . . . and the NYSHRL contain nearly identical language and are analyzed under the same framework," Shih v. JPMorgan Chase

---

[17]   While defendants further assert that the temporal proximity between Orlando's complaint and any adverse employment action is too attenuated to demonstrate a causal connection (Def. Br. at 24 n.22), the Court nevertheless considers it additional circumstantial evidence of a causal connection.  At most, eight months elapsed between Orlando's complaint at the end of summer 2011 and his termination.  (See pages 4, 6 above.)  That period of time is within the outer bounds supporting an inference of causation.  See, e.g., Chan v. Donahoe, 63 F. Supp. 3d 271, 296 (E.D.N.Y. 2014) ("The Court of Appeals for the Second Circuit has indicated that up to a seven-month gap between protected activity and an adverse employment action is 'not prohibitively remote.'" (quoting Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013)); Rouse v. City of N.Y., 08 Civ. 7419, 2009 WL 1532054 at *12 (S.D.N.Y. June 2, 2009) ("the ten month period . . . stretches the bounds of the time frame that courts have allowed to support an inference of causation based on temporal proximity").

Bank, N.A., 10 Civ. 9020, 2013 WL 842716 at *5 (S.D.N.Y. Mar. 7, 2013), the foregoing analysis applies equally to Orlando's claims under the NYSHRL.  See also, e.g., Santiesteban v. Nestle Waters N. Am., Inc., 61 F. Supp. 3d 221, 240 (E.D.N.Y. 2014).  Additionally, a finding that summary judgement is not appropriate as to Orlando's Title VII and NYSHRL claims logically precludes summary judgment under the more liberal framework of the NYCHRL.  See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010) ("[T]he retaliation inquiry under the [NY]CHRL is 'broader' than its federal counterpart." (quoting Williams v. N.Y.C. Hous. Auth., 61 A.D. 3d 62, 71, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)); see also cases cited at page 12 n.6 above.  Accordingly, summary judgement is DENIED as to Orlando's retaliation claims, except GRANTED as to his Title VII claim concerning his 2011 bonus compensation, since that is time barred.

## IV.   ORLANDO HAS SUFFICIENTLY ALLEGED A HOSTILE WORK ENVIRONMENT UNDER THE NYSHRL AND NYCHRL

Orlando's hostile work environment claim based on the July 2011 Hitler video is time barred under Title VII, but is timely under the NYSHRL and NYCHRL's three year statutes of limitations.  (See pages 20-21 above.)

### A.   NYSHRL Legal Standard

Hostile work environment claims under the NYSHRL are "'generally governed by the same standards as federal claims under Title VII.'"  Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 151 n.6 (2d Cir. 2014) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006)); see also, e.g., Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 256 (S.D.N.Y. 2014). Accordingly, to withstand summary judgment, Orlando must produce evidence to show that defendants' conduct was:

"sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986)) (internal brackets and quotation marks omitted).  The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace.  See Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).  All of the circumstances must be considered; a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it.  See Harris v. Forklift Sys., 510 U.S. 17, 21-23, 114 S. Ct. 367, 370-71 (1993); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).

Gallagher v. Delaney, 139 F.3d 338, 346-47 (2d Cir. 1998), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998); accord, e.g., Littlejohn v. City of N.Y.,795 F.3d 297, 321 (2d Cir. 2015) ("'This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.'"); Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009); Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 82 (2d Cir. 2009); Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007); Feingold v. New York, 366 F.3d 138, 149-50 (2d Cir. 2004).[18]

---

[18]     See also, e.g., Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003); Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002); Dayes v. Pace Univ., 2 F. App'x 204, 207 (2d Cir. 2001); Whidbee v. Garzarelli Food Specialties, Inc., 223 F. 3d 62, 69-71 (2d Cir. 2000); Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d Cir. 2000); Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 437-40 (2d Cir. 1999), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998); Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.), cert. denied, 522 U.S. 997, 118 S. Ct. 563 (1997); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2d Cir. 1993); Slaitane v. Sbarro, Inc., 03 Civ. 5503-04, 2004 WL 1202315 at *12-13 (S.D.N.Y. June 2, 2004) (Peck, M.J.); Viruet v. Citizen Advice Bureau, 01 Civ. 4594, 2002 WL 1880731 at *15 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.); Williams v. N.Y.C. Dep't of Sanitation, 00 Civ. 7371, 2001 WL 1154627 at *12-13 (S.D.N.Y. Sept. 28, 2001) (Peck, M.J.); Adeniji v. Admin. for Children Servs., 43 F. Supp. 2d 407, 421 (S.D.N.Y.) (Wood, D.J. & Peck M.J.), aff'd, No. 99-7561, 201 F.3d 430 (table), 1999 WL 1070027 (2d Cir. Nov. 18, 1999).

"Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment'" is insufficient to establish a Title VII discrimination claim.  Torres v. Pisano, 116 F.3d at 631; accord, e.g., Duch v. Jakubek, 588 F.3d at 762; Rios v. Buffalo & Fort Erie Pub. Bridge Auth., 326 F. App'x 612, 613-14 (2d Cir. 2009); see, e.g., Dayes v. Pace Univ., 2 F. App'x at 207 (Defendant's "comments and behavior, although boorish and inappropriate, simply do not rise to the level of behavior necessary for a jury reasonably to conclude that they were sufficiently severe or pervasive to alter the condition of [plaintiff]'s employment.").[19/]  "Thus, harms suffered in the workplace are cognizable under Title VII, even when they are not the result of 'tangible employment actions,' if they arise from conduct (1) that is 'objectively' severe or pervasive – that is, if it creates 'an environment that a reasonable person would find hostile or abusive' [the 'objective' requirement], (2) that the plaintiff 'subjectively perceive[s]' as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's . . . characteristic protected by Title VII [the 'prohibited causal factor' requirement]."  Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001) (citations omitted, bracketed material in original); see also, e.g., Robinson v. Harvard Prot. Servs., 495 F. App'x 140, 141 (2d Cir. 2012).

Isolated incidents of discriminatory comments or conduct are not sufficient to establish a hostile work environment.  E.g., Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998) ("'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of

---

[19/]   See also, e.g., DeSalvo v. Volhard, 312 F. App'x 394, 397 (2d Cir.), cert. denied, 130 S. Ct. 70 (2009); Slaitane v. Sbarro, Inc., 2004 WL 1202315 at *13; Williams v. N.Y.C. Dep't of Sanitation, 2001 WL 1154627 at *13.

employment.'"); <u>Harris</u> v. <u>Forklift Sys., Inc.</u>, 510 U.S. at 21, 114 S. Ct. at 370 ("'mere utterance of

an . . . epithet which engenders offensive feelings in an employee,' . . . does not sufficiently affect

the conditions of employment to implicate Title VII"); <u>Demoret</u> v. <u>Zegarelli</u>,  451 F.3d 140, 149 (2d

Cir. 2006) ("Isolated incidents typically do not rise to the level of a hostile work environment unless

they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an

environment.'   Generally, 'incidents must be more than episodic; they must be sufficiently

continuous and concerted in order to be deemed pervasive.'" (citations omitted)); <u>Petrosino</u> v. <u>Bell</u>

<u>Atl.</u>, 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents

of offensive conduct (unless extremely serious) will not support a claim of discriminatory

harassment.").[20/]   "Among the factors [the courts] consider are 'the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with [the] employee's work performance.'"

---

[20/]   <u>See also</u>, <u>e.g.</u>, <u>Byrne</u> v. <u>Telesector Res. Grp., Inc.</u>, 339 F. App'x 13, 18 (2d Cir. 2009)
(isolated incidents of offensive misconduct "do not rise to a sufficiently serious level to
manifest a work environment 'permeated with discriminatory intimidation'"); <u>DeSalvo</u> v.
<u>Volhard</u>, 312 F. App'x at 397; <u>Feingold</u> v. <u>New York</u>, 366 F.3d at 150 ("'As a general rule,
incidents must be more than "episodic; they must be sufficiently continuous and concerted
in order to be deemed pervasive."'"); <u>Holtz</u> v. <u>Rockefeller & Co.</u>, 258 F.3d 62, 75 (2d Cir.
2001) ("'[S]imple teasing, offhand comments, and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the terms and conditions of
employment.'"); <u>Rizzo-Puccio</u> v. <u>Coll. Auxiliary Servs., Inc.</u>, No. 99-9272, 216 F.3d 1073
(table), 2000 WL 777955 at *3 (2d Cir. June 14, 2000) ("[I]solated remarks or occasional
episodes of harassment do not constitute a hostile environment within the meaning of Title
VII."); <u>Quinn</u> v. <u>Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998) ("As a general
matter, 'isolated remarks or occasional episodes of harassment will not merit relief under
Title VII; in order to be actionable, the incidents of harassment must occur in concert or with
a regularity that can reasonably be termed pervasive.'"), <u>abrogated on other grounds by</u> <u>Nat'l</u>
<u>R.R. Passenger Corp.</u> v. <u>Morgan</u>, 536 U.S. 101, 122 S. Ct. 2061 (2002); <u>Slaitane</u> v. <u>Sbarro,</u>
<u>Inc.</u>, 2004 WL 1202315 at *13; <u>Diaz</u> v. <u>Weill Med. Ctr. of Cornell Univ.</u>, 02 Civ. 7380, 2004
WL 285947 at *18 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.) (& cases cited therein), <u>aff'd</u>, 138
F. App'x 362 (2d Cir. 2005).

Feingold v. New York, 366 F.3d at 150 (quoting Harris v. Forklift Sys., Inc., 510 U.S. at 23, 114

S. Ct. at 371).[21]

**B.     Orlando's Allegations Establish A Hostile Work Environment Claim Under The NYSHRL**

Defendants assert that the showing of the Hitler video at the Amsterdam off-site

meeting was neither objectively hostile, nor sufficiently severe or pervasive to create a hostile work

environment.  (Dkt. No. 75: Def. Br. at 16-21.)[22]  A single incident must be "extraordinarily severe"

to create a hostile work environment.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000),

superceded by regulation other grounds by, N.Y.C. Local L. No. 85; see also, e.g., Williams v.

N.Y.C. Hous. Auth., 154 F. Supp. 2d 820, 825-26 (S.D.N.Y. 2001) ("The display of a noose would

fall within this category of intimidating conduct.  The fact that a white supervisor was displaying

the noose obviously intensifies the intimidating effect.  Thus, even though there may not have been

a large number of isolated remarks or actions, the severity of the conduct at issue, if proven, would

be sufficient to establish a hostile work environment." (fn. omitted)).

---

[21]     Accord, e.g., Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d at 82; Patane v. Clark, 508 F.3d at 113; Demoret v. Zegarelli,  451 F.3d at 149-50; Mormol v. Costco Wholesale Corp., 364 F.3d at 58; Terry v. Ashcroft, 336 F.3d at 148; Slaitane v. Sbarro, Inc., 2004 WL 1202315 at *13; see also, e.g., Clemente v. N.Y.S. Div. of Parole, 01 Civ. 3945, 2004 WL 1900330 at *12 (S.D.N.Y. Aug. 24, 2004) ("As for pervasiveness, the Court concludes that six occurrences of relatively mild workplace difficulty over the course of a year do not, as a matter of law, constitute 'pervasive' harassment.").

[22]     The parties do not dispute that as a supervisor Auld's behavior is imputed to BNPP.  See, e.g., Jackson v. N.Y.S. Dep't of Labor, 09 Civ. 6608, 2013 WL 449894 at *4 (S.D.N.Y. Feb. 6, 2013) ("A supervisor's conduct creating a hostile work environment is imputed to the employer under principles of agency.") (citing Murray v. N.Y. Univ. Coll. of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995) (employer's liability for supervisor's conduct creating hostile work environment is "absolute"))).

As an initial matter, Orlando has demonstrated that he subjectively perceived that the Hitler video made his work environment hostile.  (See Dkt. No. 86: Orlando Aff. ¶ 62 ("Following the second screening, Orlando became emotionally distressed and upset . . . ."); id. ¶ 65 (following the first screening Orlando expressed his "deep" and "extreme" offense to two supervisors); id. ¶ 65 ("Orlando was so distressed after the second screening that he immediately spoke with his rabbi . . . [and] 'expressed a concern about the fact that [he] would work with Eric Auld going forward.'"); id. ¶ 73 (Orlando met with Auld after the seminar to express that he was "deeply hurt" by the video); Dkt. No. 88: Stern Aff. Ex. 91: Orlando Dep. at 100 ("I discussed . . . with my rabbi, Benji Silverman, when I came back what should be the appropriate action."); Dkt. No. 92: Egan Reply Aff. Ex. 6: Orlando Dep. at 265 ("In my house, suffering multiple panic attacks, very, very difficult moment for my family in November 2012.").)[23/]

As to the video's severity, BNPP's internal disciplinary report regarding the video's co-creator, former BNPP employee Clive Banks, noted that "Hitler is considered to have been one of the most odious historical figures."  (Stern Aff. Ex. 87: 2/5/13 Report for Clive Banks at 2.)  The report further found:

> The content of the video (including the alterations introduced by the subtitles) was not appropriate for use at a business offsite run on behalf of an international bank. . . . [Banks'] . . . judgement in proceeding with the video was poor.  His assessment that the risk of running such footage was negligible or low clearly failed to take into account the potential for such footage to be interpreted in different ways and to cause offense. . . .  Hitler is considered to be one of the most odious historical figures.  For the [disciplinary] Panel there is a clear difference between an individual choosing at their discretion to watch a film about Hitler or YouTube footage of this clip in their own time and being forced to watch it twice as part of an Offsite (where they cannot

---

[23/]    The standard is subjective.  Thus, while Mel Brooks' play and movie "The Producers" were very successful, Orlando found them offensive.  (Orlando Aff. ¶ 69.)  Of course, Orlando could avoid "The Producers," but could not avoid the workplace showing of the Hitler video at issue in this case.

switch off/leave if it makes them feel uncomfortable).  Given the multiracial/ multinational audience at the Offsite (which also, no doubt, represented diverse religious beliefs), the [disciplinary] Panel believes that alluding to such a major world conflict and specifically to the Nazi regime in a corporate context, when it may have represented painful and difficult memories for the members of the audience or their families, clearly was not appropriate. . . . [T]he [disciplinary] Panel has evidence from several sources that [the video was not universally well received]. . . . [Banks] did not consider the views of Jewish participants.

(Stern Aff. Ex. 87: 2/5/13 Report for Clive Banks at 1-2.)

Courts in this Circuit and elsewhere have noted that the Nazi regime and swastika are symbols of hatred capable of arousing fear and intimidation.  See, e.g., United States v. Figueroa, 548 F.3d 222, 228 (2d Cir. 2008) ("It was apparently, and understandably, assumed by the district court and the parties that the swastika is commonly associated with white supremacism and neo-Nazi groups harboring extreme forms of racial, religious and ethnic hatred and prejudice against minority groups . . ."); Lake v. AK Steel Corp., No. 03-CV-517, 2006 WL 1158610 at *26 (W.D. Pa. May 1, 2006) ("Swastikas are a symbol of a regime of hatred unparalleled in world history.  That regime was dedicated to the oppression of those of Jewish heritage through genocide. The symbol is one of hatred and oppression."); Williams v. N.Y.C. Hous. Auth., 154 F. Supp. 2d at 824 ("Those of us for whom a particular symbol is just that–a symbol– may have difficulty appreciating the very real, very significant fear that such symbols inspire in those to whom they are targeted.  No less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear." (quoting Vance v. Southern Bell Tel. & Tel. Co., 983 F.2d 1573, 1583 (11th Cir.1993) (Fay, C.J., dissenting), cert. denied, 513 U.S. 1155, 115 S. Ct. 1110)); Turner v. Barr, 811 F.Supp. 1, 3 (D.D.C. 1993) (supervisor's comment about the Holocaust supported Jewish employee's claim of religious discrimination); Tillmon v. Garnett Corp., No. 97 C 8212, 1999 WL 592119 at *3 n.1 (N.D. Ill. Aug.

2, 1999) ("[P]laintiff's claim that a swastika was carved into his tool box could be objectively considered extremely serious.").

Orlando has presented evidence to demonstrate that at a mandatory work seminar he was made to watch a video that included actors portraying Hitler and soldiers in Nazi uniform including swastika armbands, and various spoken references to the Nazi regime, including the phrases "Third Reich," "my Fuhrer," "Goebbels," and "a large Polish operation."  (See pages 3-4 above.)  Orlando additionally presented evidence that the same video was played a second time despite his complaints to management that it offended him as a Jewish person.  (See page 6 above.)

Moreover, the Hitler video was not played in a vacuum.  Orlando testified at his deposition that his colleagues made a number of anti-Semitic comments during his tenure at BNPP. (Dkt. No. 82: Egan Aff. Ex. 5: Orlando Dep. at 47-56, 76-77).  While defendants correctly assert that claims premised on these remarks are time-barred (Def. Br. at 19 n.16), Orlando "may 'us[e] the prior [time-barred] acts as background evidence in support of a timely claim' of workplace discrimination."  MacMillan v. Millennium Broadway Hotel, 09 Civ. 6053, 2011 WL 4357523 at *5 (S.D.N.Y. Sept. 16, 2011).[24/]  Accordingly, the Court finds that Orlando has presented sufficient

_____

[24/]    Defendants additionally assert that "there is no evidence that the video was directed at Orlando."  (Def. Br. at 19.)  Discriminatory conduct need not be "directed at" an employee in order to create an environment that is hostile because of the employee's protected characteristic.  See, e.g., Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330, 389-91 (S.D.N.Y. 2002) (employee's observation of Ku Klux Klan robes and a noose with a colleague's name on it sufficient to support a hostile work environment claim); Jones v. N.Y.C. Dep't of Corr., 99 Civ. 10031, 2001 WL 262844, at *5 (S.D.N.Y. Mar. 15, 2001) ("Incidents need not be in the plaintiff's presence or directed at the plaintiff to support his hostile work environment claim." (citing Schwapp v. Town of Avon, 118 F.3d 106, 111-12 (2d Cir.1997))); see also, e.g., Schwapp v. Town of Avon, 118 F.3d at 111 ("Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." (citations omitted)); Thomas v. iStar
(continued...)

evidence to allow a reasonable jury to conclude that he was subjected to a hostile work environment because of the two showings of the Hitler video at the mandatory conference.  Defendants' summary judgment motion thus is <u>DENIED</u> as to Orlando's NYSHRL hostile work environment claim.

### C.    Orlando's Allegations Establish A Hostile Work Environment Claim Under The NYCHRL

Claims under the NYCHRL must be reviewed "separately and independently from any federal and state law claims."  <u>Mihalik</u> v. <u>Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 109 (2d Cir. 2013); <u>see also</u> <u>Armstrong</u> v. <u>Metro. Transp. Auth.</u>, 07 Civ. 3561, 2015 WL 992737 at *6 (S.D.N.Y. Mar. 3, 2015) ("federal and state civil rights laws [are] a floor below which the City's Human Rights law cannot fall").   "In determining whether a claim of hostile work environment survives summary judgment under the NYCHRL, the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of his or her protected status."  <u>Armstrong</u> v. <u>Metro. Transp. Auth.</u>, 2015 WL 992737 at *6 (quotations omitted).  Because Orlando has adequately demonstrated a claim under the NYSHRL, he has also done so under the broad and remedial standards of the NYCHRL.  <u>See</u>, <u>e.g.</u>, <u>Pryor</u> v. <u>Jaffe & Asher, LLP</u>, 992 F. Supp. 2d 252, 260 (S.D.N.Y. 2014); <u>Armstrong</u> v. <u>Metro. Transp. Auth.</u>, 2015 WL 992737 at *6.

## V.    <u>AULD AND OLIVEIRA'S INDIVIDUAL LIABILITY</u>

Orlando contends that Auld and Oliveira violated NYSHRL § 290 "by aiding, abetting, inciting and coercing" the "unlawful discrimination."  (Dkt. No. 2: Compl. ¶¶ 268-72.)  As

---

[24]/      (...continued)
<u>Fin., Inc.</u>, 438 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) ("Since the Court must consider the totality of circumstances in hostile work environment actions, it need not limit its inquiry to evidence of racially charged comments made in [plaintiff's] presence or directed at him particularly."), <u>aff'd</u>, 629 F.3d 276 (2d Cir. 2010).

a preliminary matter, Orlando presents neither argument nor evidence to support a finding that Oliveira individually is liable for any of the conduct alleged.  (See generally Dkt. No. 85: Orlando Opp. Br.)  Summary judgement thus is GRANTED as to Orlando's aiding and abetting claim against Oliveira.

As to Auld, Orlando argues that Auld is personally liable under the NYSHRL and NYCHRL for retaliatory conduct and creating a hostile work environment.  (Orlando Opp. Br. at 18, 21.)  Because Orlando's complaint alleges only claims for individual liability under the NYSHRL (Compl. ¶¶ 266-69), the Court will not consider any claim under the NYCHRL.  See e.g., Kleinman v. Elan Corp., plc, 706 F.3d 145, 153 (2d Cir. 2013) ("a party may not amend pleadings through a brief"); WSP USA Corp. v. Marinello, 13 Civ. 4591, 2013 WL 6704885 at *5 n.1 (S.D.N.Y. Dec. 19, 2013) ("To the extent that plaintiff, for the first time, asserts a [new] claim in its motion papers, parties may not amend pleadings through statements in briefs.").

NYSHRL § 296(6) provides that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."  N.Y. Exec. Law § 296(6).  "The Second Circuit has read § 296(6) broadly to find that supervisors and co-workers can be liable pursuant to this section even if they do not have the ability to hire and fire employees, so long as they 'actually participate[d] in the conduct giving rise to the discrimination.'"  Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11-CV-5528, 2014 WL 4773975 at *34 (E.D.N.Y. Sept. 24, 2014) (quoting Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004) (alteration omitted)); see also, e.g., McArdle v. Arms Acres, Inc., 03 Civ. 5721, 2009 WL 755287 at *13 (S.D.N.Y. Mar. 23, 2009).

Orlando has submitted evidence demonstrating that Auld partook in creating the Hitler video and showing it at the Amsterdam off-site.  (See page 3 above.)  Orlando complained

to Auld (and De Lambilly) that he found the video offensive following its first screening, and De Lambilly separately relayed Orlando's complaint to Auld.  (See page 4 above.)  The Hitler video nevertheless was shown in full a second time, without Auld's preventing or interrupting it, which as the co-host of the off-site seminar he was in a position to do.  (See pages 3-4 above.)  Orlando has submitted evidence that when he complained after the fact about the Hitler video, Auld threatened his career.  (See pages 4-5 above.)  Finally, Orlando has submitted evidence that within months of that complaint, his bonus compensation was reduced from previous years' levels and his position in New York was terminated, actions for which Auld was responsible.  (See pages 5-6 above.)

These allegations are sufficient to give rise to a question of fact as to whether Auld participated in the conduct giving rise to Orlando's hostile work environment and retaliation claims. See, e.g., Delisi v. Nat'l Ass'n of Prof'l Women, Inc., 48 F. Supp. 3d 492, 496 (E.D.N.Y. 2014); Stathatos v. Gala Res., LLC, 06 Civ. 13138, 2010 WL 2024967 at *8 (S.D.N.Y. May 21, 2010) (defendants "aided and abetted the creation of a hostile work environment by participating in the harassing behavior and by not acting to prevent others from engaging in harassing behavior."). Accordingly, summary judgment is DENIED as to Orlando's aiding and abetting claims against Auld.

## V.   ORLANDO'S EMPLOYMENT DISCRIMINATION CLAIMS ARE WAIVED

Orlando has provided neither evidence nor argument to support his first, second, third and fourth claims for relief, for unlawful employment discrimination based on religion.  (Dkt. No. 2: Compl. ¶¶ 211-27.)  Accordingly, the Court considers them abandoned.  See, e.g., Fenn v. Verizon Commc'ns, Inc., 08 Civ. 2348, 2010 WL 908918 at *11 (S.D.N.Y. Mar. 15, 2010) (collecting cases).

## CONCLUSION

For the reasons set forth above, defendants' summary judgment motion (Dkt. No. 66) is <u>GRANTED</u> as to Orlando's employment discrimination claims, Title VII claims for hostile work environment and retaliation as to his bonus (since both are time barred), and NYSHRL claim for individual liability as to Oliveira.  Defendants' summary judgment motion is <u>DENIED</u> in all other respects.

The Joint Pretrial Order is due November 25, 2015.


SO ORDERED.

Dated:          New York, New York
               October 22 , 2015



_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:          All Counsel